**UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THREE IPHONE CELL PHONES, ONE WITH A CLEAR CASE, ONE WITH A PINK CASE, AND ONE WITH A CLEAR KATE SPADE CASE | No. 22-mj-227-01-AJ |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Galen Doud, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the United States Drug Enforcement Administration ("DEA") and have been so employed since May 2017. I am presently assigned to the Manchester, New Hampshire District Office. During my employment with DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, methamphetamine, diverted pharmaceuticals, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections 841 and 846. I have conducted or participated in, among other things, surveillance, the execution of search and arrest warrants, debriefings of informants and confidential sources, and reviews of taped conversations relating to narcotics trafficking. I have authored drug-related search warrant requests and successfully executed such warrants resulting in the seizure of drugs and other contraband. I have received extensive training in the field of narcotics enforcement and investigations. I am very familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs.

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of

Criminal Procedure 41(a)(2)(c). As a federal agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

3.      The facts and information contained in this affidavit are based on my personal knowledge and observations, as well of that of other special agents, task force officers, and law enforcement officers involved in this investigation, and information gained through my training and experience.

4.      Based on my training and experience and the facts set forth in this affidavit, I submit that there is probable cause to believe the Target Devices described in Attachment A contain evidence of one or more violations of Title 21, United States Code, Sections 841(a) and/or 846 (attempt and conspiracy), identified in Attachment B. My affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **PROBABLE CAUSE**

5.      On July 7, 2022, investigators directed a Cooperating Source ("CS-1") to conduct a controlled purchase of methamphetamine from a subject (subsequently, "CS-2") known to the DEA as a supplier of methamphetamine in the Manchester, New Hampshire area.[1] CS-1 arranged to purchase a pound of methamphetamine from CS-2 outside a specified hotel in Manchester, New Hampshire.[2] When CS-2 appeared outside the hotel, he was arrested and found

---

1 For ease of reference and the protection of the individuals, cooperating sources defendants referenced herein will be referred to using the pronouns "he/him/his" regardless of their gender.

2 CS-1 provided information as a Confidential Source for the DEA. CS-1 has pending charges for sale of a controlled drug. CS-1 provided information in hopes of receiving prosecutorial and/or judicial consideration. CS-1 has prior convictions including know present c/drug, falsifying physical evidence, resisting arrest/detention, criminal mischief, reckless conduct, possession of a controlled drug, disorderly conduct, simple assault, controlled drug: acts prohibited, theft by unauthorized taking, and sale of methamphetamine.

to be in possession of approximately 520 grams of a substance consistent with the visual appearance of methamphetamine.

6.      After his arrest, CS-2 immediately agreed to cooperate with investigators and identified DEFENDANT-1 as his methamphetamine source of supply.[3] At investigators' direction, during the evening of July 7, 2022, CS-2 called DEFENDANT-1 and arranged to purchase two to four pounds of methamphetamine, which DEFENDANT-1 agreed to deliver to the same Manchester hotel. A series of follow-up calls occurred to finalize the transaction, including one instance where DEFENDANT-2 called CS-2 from his own telephone. During the calls, CS-2 was told that DEFENDANT-1 and DEFENDANT-2 were obtaining their own methamphetamine supply at a casino in the Boston, Massachusetts area.

7.      On July 7, 2022, investigators conducted surveillance at that casino in Massachusetts and observed DEFENDANT-1's vehicle in the parking lot. Investigators observed DEFENDANT-1, DEFENDANT-2, and an additional male subject in the casino. Investigators observed DEFENDANT-1 and DEFENDANT-2 moving bags back to DEFENDANT-1's vehicle. DEFENDANT-1 and DEFENDANT-2 left the casino, returned to the casino and retrieved an additional container that they had evidently forgotten, and then left again, ultimately driving north on Interstate 93 toward New Hampshire.

8.      On July 8, 2022, law enforcement stopped the vehicle along Interstate 93 after it entered New Hampshire. DEFENDANT-2 was found to possess, on his person, approximately 47 grams of a substance that field-tested positive for the properties of methamphetamine

---

3 CS-2 provided information as a Cooperating Source for the DEA. CS-2 has pending charges for distribution of a controlled substance. CS-2 provided information in hopes of receiving prosecutorial and/or judicial consideration. CS-2 has prior convictions including fraud- insuff funds check, possession of barbiturate, possession of marijuana, possession of drug equip, larceny, driving after revocation/suspension subsequent, receiving stolen property, indecent exposure/gross lewdness, possession of a controlled drug, and driving after revocation/suspension.

("presumptive methamphetamine"). A search of the vehicle yielded approximately 2,814 grams of presumptive methamphetamine in a circular bag inside a larger suitcase in the driver's-side rear of the vehicle.

9.      After being advised of his *Miranda* warnings, DEFENDANT-1 admitted in summary and relevant part:

    a.      DEFENDANT-1 initially denied there were any drugs in the vehicle he and DEFENDANT-2 were in when stopped by police. DEFENDANT-1 explained he and DEFENDANT-2 picked up an unknown quantity of methamphetamine from a black male known to him as "Black" and/or "Blackie" at the casino a short time prior to being stopped by police. DEFENDANT-1 said he met his source of supply (for whom "Black" works for as a runner or drug distributor) approximately one to two months ago through DEFENDANT-2. DEFENDANT-1 said he and DEFENDANT-2 obtain between 10 to 18 pounds of methamphetamine from their supplier roughly once per week. DEFENDANT-1 said their last pick up prior to being stopped was the smallest amount of methamphetamine they had received from this supplier. DEFENDANT-1 said sometimes the supplier ships methamphetamine to him and DEFENDANT-2, and other times they pick up methamphetamine from the supplier on behalf of runners in the Boston area, similar to how they picked up the methamphetamine just prior to being stopped. DEFENDANT-1 said in the coming days, he was expecting a larger quantity of methamphetamine via FedEx than what was just obtained prior to being stopped by police.

10.     DEFENDANT-2 identified his mailing address as 21 Moulin Lane, Turner, Maine, and said his physical address was another identified address where he lived with

DEFENDANT-1. After being advised of his *Miranda* warnings, DEFENDANT-2 admitted in summary and relevant part:

      b.    DEFENDANT-2 was asked if he wanted to speak with investigators to which he said, "No." DEFENDANT-2 did not say he wished to speak with an attorney. DEFENDANT-1 and DEFENDANT-2 were allowed to speak to each other as they requested. After a search of their vehicle, New Hampshire State Police Sergeant Shane Larkin asked DEFENDANT-2 if he requested to speak with a lawyer at any point. DEFENDANT-2 said he never asked for a lawyer but that he only declined to answer questions. DEFENDANT-2, without questioning, voluntarily stated he intended to get out of the drug trade business, but it was challenging because of DEFENDANT-1's involvement. DEFENDANT-2 said he and DEFENDANT-1 visit the Encore Casino on a near-weekly basis, during which times DEFENDANT-1 would regularly obtain large amounts of controlled substances, including methamphetamine, from people DEFENDANT-2 did not wish to identify. DEFENDANT-2 said during the late hours of July 7, 2022, he observed a black male whom DEFENDANT-1 referred to as "Black" entered their hotel room. Upon exiting the bathroom, DEFENDANT-2 observed DEFENDANT-1 putting methamphetamine and what he believed to be other controlled substances in a gray bag described similar to the bag where the suspected methamphetamine in their vehicle was found. DEFENDANT-2 did not observe any exchange of controlled substances nor money between DEFENDANT-1 and "Black," but added he was aware the above described suspected controlled substances were not in the room prior to Black's arrival. DEFENDANT-2 assumed this gray bag would contain approximately 10 pounds of methamphetamine, which he assumed based on prior

purchases, would cost $35,000. DEFENDANT-2 said he first met Black approximately one to one and a half years ago at the Encore Casino. DEFENDANT-2 was asked about a package which may be en route to him. DEFENDANT-2 became slightly distraught before confirming a package was likely going to be delivered to him in Maine. When asked what the package would contain, DEFENDANT-2 said approximately 20 pounds of methamphetamine. DEFENDANT-2 said he regularly provides a mailing address to individuals whom he did not wish to identify in order to receive methamphetamine. After providing a mailing address to the unidentified individual(s), a package would typically arrive eight days later with 20 pounds of methamphetamine. DEFENDANT-2 said he provided the mailing address of 21 Moulin Lane, Turner, Maine to the unidentified individuals on approximately July 5, 2022. DEFENDANT-2 said he has never received a tracking number for the packages, and added this was the first time he provided this particular address. DEFENDANT-2 said the residents of the address do not have involvement with the receipt of distribution of the methamphetamine in the packages. Following the receipt or the packages, DEFENDANT-2 said he is typically contacted to meet with unknown individuals at random locations to provide cash payment for these packages. DEFENDANT-2 said he pays approximately $3,500 per pound of methamphetamine.

11.     Incident to the arrest of DEFENDANT-1 and DEFENDANT-2, officers seized the Target Devices (one belonging to DEFENDANT-1 and two belonging to DEFENDANT-2).

12.     Investigators made efforts to locate the parcel being shipped to Maine and ultimately learned of a package shipped on July 7, 2022 from Canoga Park, California destined for 21 Moulin Lane, Turner, Maine.

13.     Investigators obtained a search warrant in the District of Maine to search the parcel, which was found to contain approximately 11,238 grams of 100% pure methamphetamine.

14.     Based on my training and experience, and information provided to me by other agents, I am aware that individuals involved in drug trafficking frequently use electronic devices, including smartphones, to carry out, communicate about, and store records related to drugs and drug trafficking. These tasks are frequently accomplished through phone calls, text messages, encrypted messages, and photographs. Based on my training and experience, I know that dealers and others involved in the drug trade frequently utilize multiple mobile phones in connection with their illegal drug activity. For example, individuals involved in drug trafficking frequently utilize one phone to communicate with drug customers and another phone to communicate with other drug-related associates (e.g., suppliers/organizers). Individuals involved in drug trafficking frequently change their phones and/or phone numbers, and their utilization of multiple phones can mitigate the disruption associated with these changes (for example, a dealer can change the phone used to communicate with drug suppliers or organizers while not changing the phone used to communicate with customers, or vice versa).

15.     Based on my training, experience, and information provided by other law enforcement officers, I know that smartphones now function essentially as small computers. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Based on my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones.

/s/ Galen Doud
Galen Doud, Special Agent
U.S. Drug Enforcement Administration

The Affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit.

ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

Date: **Nov 4, 2022**

Time: 11:53 AM, Nov 4, 2022

## ATTACHMENT A – PROPERTY TO BE SEARCHED

The property to be searched consists of the following electronic equipment seized from

DEFENDANT-1 and DEFENDANT-2 following their arrest on July 8, 2022 (collectively, the

"Target Devices"):

    a.   An iPhone with a clear case (seized from DEFENDANT-1).

    b.   An iPhone with a pink case (seized from DEFENDANT-2).

    c.   An iPad with a clear Kate Spade case (seized from DEFENDANT-2).

The equipment is located at the DEA's Manchester District Office in Bedford, New Hampshire.

**ATTACHMENT B – ITEMS TO BE SEIZED**

1.    All records, in whatever form, that constitute evidence of the violation of Title 21, United States Code, Sections 841(a) and/or 846 (attempt and conspiracy) from January 1, 2021 to the present, including those related to:

    a)    records of drug trafficking activities;

    b)    lists of customers and related identifying information;

    c)    any information recording schedule, whereabouts, or travel, including calendar, e-mails, cell tower, and GPS data;

    d)    all bank records, checks, credit card bills, account information, and other financial records;

    e)    the identity, location, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

2.    Evidence of user attribution showing who used or owned the equipment at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.